UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROSEMARY JENKINS,
     Plaintiff,

                                     CIVIL ACTION NO.
     v.                                15-10003-MBB

CITY OF TAUNTON, CHIEF EDWARD
WALSH, MARK BRADY, ROBERT KRAMER,
MATTHEW SKWARTO, RALPH SCHLAGETER,
JEFFREY MARTIN, and FRED BOLTON,
     Defendants.


**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 58)**

**September 29, 2017**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for summary judgment filed by defendants City of Taunton, Chief Edward Walsh ("Walsh"), Mark Brady ("Brady"), Robert Kramer ("Kramer"), Matthew Skwarto ("Skwarto"), Ralph Schlageter ("Schlageter"), Jeffrey Martin ("Martin"), and Fred Bolton ("Bolton") (collectively "defendants").  (Docket Entry # 58).  Plaintiff Rosemary Jenkins ("plaintiff") opposes the motion.  (Docket Entry # 62).  After conducting a hearing, this court took the motion (Docket Entry # 58) under advisement.

<u>PROCEDURAL BACKGROUND</u>

The complaint sets out the following claims: (1) an unreasonable search against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton in violation of 42 U.S.C. § 1983 ("section 1983") (Count I); (2) a false arrest against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton in violation of section 1983 (Count II); (3) excessive force in violation of section 1983 against Kramer and another unidentified officer (Count III); (4) a failure to intervene in violation of section 1983 against Brady (Count IV); (5) a failure to intervene to prevent the unreasonable search and the use of excessive force in violation of section 1983 against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton (Count V); (6) a due process violation under section 1983 against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton (Count VI); (7) a conspiracy to violate plaintiff's constitutional rights in violation of the Fourth, Fifth, and Fourteenth Amendments under section 1983 against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton (Count VII); (8) an unconstitutional policy in violation of section 1983 against the City of Taunton and Walsh (Count VIII); (9) a violation of Massachusetts General Laws chapter 12, section 11I ("the MCRA") against Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton (Count IX); (10) assault and battery against Kramer and an unidentified officer (Count X); (11) a false arrest and imprisonment against Brady, Kramer,

Skwarto, Schlageter, Martin, and Bolton (Count XI); (12)

malicious prosecution against Brady, Kramer, Skwarto,

Schlageter, Martin, and Bolton (Count XII); (13) abuse of

process against Brady, Kramer, Skwarto, Schlageter, Martin, and

Bolton (Count XIII); and (14) intentional infliction of

emotional distress against "defendants" (Count XIV).  (Docket

Entry # 1).

On November 17, 2015, the parties filed a joint stipulation

dismissing Count VIII, which "contains the only claims against .

. . City of Taunton and Edward Walsh."  (Docket Entry # 36).

Subsequently on December 13, 2016, the parties filed a joint

stipulation dismissing the following claims against the

following defendants:  (1) Count II against Brady, Skwarto,

Schlageter, Martin, and Bolton; (2) Count IV in its entirety;

(3) Count VI against Brady, Bolton, and Martin; (4) Count IX

against Brady, Skwarto, Schlageter, Martin, and Bolton as to the

use of force and the wrongful arrest of plaintiff; (5) Count XI

against Brady, Skwarto, Schlageter, Martin, and Bolton; (6)

Counts XII and XIII against Brady, Martin, and Bolton; and (7)

Count XIV against Brady, Skwarto, Schlageter, Martin, and Bolton

"as to the use of force against and the wrongful arrest of

plaintiff."  (Docket Entry # 56).

The joint stipulation of dismissal describes Count XIV as

setting out a "use of force against and wrongful arrest of the

plaintiff." (Docket Entry # 56). As framed in the complaint, however, Count XIV is a claim for intentional infliction of emotional distress against "Defendants." The parties are therefore directed to confer and file a status report clarifying paragraph seven of the joint stipulation within 14 days of the date of this opinion.

STATEMENT OF FACTS

1. <u>General Background</u>

Plaintiff is a 66-year-old female. (Docket Entry # 63, ¶ 1) (Docket Entry # 69, ¶ 1). On August 2, 2013, she resided in apartment three of a building located at 112 High Street ("the building") in Taunton, Massachusetts. (Docket Entry # 63, ¶ 2) (Docket Entry # 69, ¶ 2). The building is a three story, multi-family residential apartment building with four apartment units. (Docket Entry # 63, ¶ 3) (Docket Entry # 69, ¶ 3). It has a front entrance and a rear entrance which leads to separate stairwells. (Docket Entry # 60-2, pp. 47-59). The apartment in which plaintiff resided, apartment three, is the only residence located on the third floor. (Docket Entry # 63, ¶ 3) (Docket Entry # 69, ¶ 3).

Plaintiff's son, Domingo Jenkins Sr. ("Domingo"), lived on the first floor of the building. (Docket Entry # 63, ¶ 4) (Docket Entry # 69, ¶ 4). Plaintiff's other son, Reginald Jenkins Sr. ("Reginald"), from whom plaintiff is estranged

4

(Docket Entry # 63, ¶ 5) (Docket Entry # 69, ¶ 5), never resided in the building. (Docket Entry # 63, ¶ 6) (Docket Entry # 69, ¶ 6). Reginald had been arrested several times by members of the Taunton Police Department ("TPD"), but these arrests never occurred at the building. (Docket Entry # 63, ¶ 13) (Docket Entry # 69, ¶ 13). As of August 2, 2013, according to Skwarto's affidavit, Reginald's address was listed in TPD's computer system as 112 High Street. (Docket Entry # 60-13, ¶ 7). A TPD log incident report for an incident that occurred on July 12, 2013, in which a group including Reginald allegedly threatened to shoot up a local restaurant listed Reginald's address as 112 High Street without an apartment number. (Docket Entry # 60-3, pp. 1-2). Another TPD log entry dated July 31, 2013, which described an incident in which Reginald purportedly committed an assault and battery on an individual, also listed Reginald's address as 112 High Street without an apartment number.[1] (Docket Entry # 60-4, pp. 1-2).

Since 2005, plaintiff has had full legal custody of five of Reginald's children. (Docket Entry # 63, ¶ 7) (Docket Entry # 69, ¶ 7). The children occasionally walked to Reginald's house on Union Street in Taunton. (Docket Entry # 63, ¶ 8) (Docket

---

[1] The discussion section summaries additional TPD records reflecting Reginald's address as 112 High Street, Apartment Four.

Entry # 69, ¶ 8).  Reginald has visited his children at the building, but the record is unclear as to the frequency of such visits.  (Docket Entry # 60-2, pp. 26-27).  In August 2013, the children were approximately eight, nine, 12, 14, and 19 years old.  (Docket Entry # 63, ¶ 9) (Docket Entry # 69, ¶ 9).  Reginald's sixth child, Reginald Jenkins, Jr. ("Reginald Jr."), was approximately 16 in August 2013 and did not live with plaintiff.  (Docket Entry # 63, ¶ 10) (Docket Entry # 69, ¶ 10).  Prior to August 2, 2013, plaintiff had called TPD on multiple occasions for assistance in dealing with her grandchildren.  (Docket Entry # 63, ¶ 11) (Docket Entry # 69, ¶ 11).  As a result, members of TPD were aware that plaintiff lived at the multi-unit building with her grandchildren and, drawing reasonable inferences, that she lived in apartment three on the third floor.  (Docket Entry # 63, ¶ 12) (Docket Entry # 69, ¶ 12).

2.   The Shooting

According to a statement by Assistant District Attorney Brian Griffin ("Griffin") during a November 2014 guilty plea proceeding, a young man named Darian Robinson ("Robinson"), together with his friends, confronted Reginald in Taunton on August 2, 2013 and then returned to Fall River, Massachusetts.

(Docket Entry # 60-6, p. 11).[2] Griffin further stated that later on August 2, 2013, Robinson returned with his aunt Alicia Burton ("Burton") and Burton's son Andre Thompson ("Thompson") to Taunton "where they knew the defendant [Reginald] lived." (Docket Entry # 60-6, p. 11). With respect to the specific location of the confrontation, Griffin stated that, "The confrontation took place out in front of his [Reginald's] house." (Docket Entry # 60-6, p. 11). The address for the house was not mentioned in the guilty plea proceeding. (Docket Entry # 60-6). During the proceeding, the Associate Justice of the Superior Court ("the judge") asked Reginald, who was sworn, if he was "confronted by them when they came from Fall River back up to Taunton. In other words, they showed up at your property after the first incident." (Docket Entry # 60-6, pp. 14-15). In response, Reginald answered, "Yes, sir." (Docket Entry # 60-6, p. 15). Reginald did not indicate whether the affirmative response was directed only towards a portion of the judge's question, or towards everything including the part which would confirm Reginald's ownership of the property. (Docket Entry # 60-6, p. 15).

---

[2] The proceeding took place on November 20, 2014 in Massachusetts Superior Court (Bristol County) ("Superior Court"). (Docket Entry # 60-6, p. 1). Reginald agreed to Griffin's statement of facts under oath. (Docket Entry # 60-6, p. 14).

Griffin then stated that, after Burton, Thompson, and Robinson met with Reginald at about 9:30 p.m. that evening, Reginald "pointed the gun down to the body, the lower body of the three [Burton, Thompson, and Robinson] and fired one shot." (Docket Entry # 60-6, p. 12). "That shot hit Andre Thompson in the leg . . .." (Docket Entry # 60-6, p. 12). Reginald then pointed the gun at Burton's chest, threatening her. (Docket Entry # 60-6, p. 12).

3. <u>Dispatch Calls</u>

At approximately 9:19 p.m. on August 2, 2013, TPD received multiple 911 calls for the shooting described in the preceding paragraph. (Docket Entry # 60-13, ¶ 11). Approximately four minutes later at 9:23 p.m., Taunton Police dispatch sent a radio communication to all police officers which stated that Burton had informed dispatch that she had witnessed a shooting which occurred in the parking lot of Alan Walker Insurance located at 120 High Street. (Docket Entry # 63-4, pp. 2, 9-10, 16) (Docket Entry # 69-1).

According to the affidavit by Skwarto, dispatch informed him that Reginald "went into his apartment at 112 High Street after the shooting."[3] (Docket Entry # 60-13, ¶ 15). The

---

[3] This statement is not considered for the truth of the matter asserted, i.e., that Reginald went into 112 High Street. Rather, it is considered to show knowledge.

dispatch recording states, "We are looking for Reggy Jenkins [Reginald], he just shot at Burton's son and she watched him do it." (Docket Entry # 69-1). The dispatch recording does not mention the address 112 High Street, but only states that, "he's [Reginald] inside the apartment over there where he lives." (Docket Entry # 69-1). The recording also states that Burton informed dispatchers that, "Reggy [Reginald] shot her son, he's inside of his apartment over there right now," and "she's [Burton] on the way down to the station to give a statement." (Docket Entry # 69-1). The dispatch continued by stating, "She [Burton] said he [Reginald] shot her son and then, I think she said, she was screaming on the phone, she said he grazed his leg or something, and she went to confront him, he shot her too or something, and he's, uh [sic], he's inside the apartment over there where he lives." (Docket Entry # 69-1). An unknown officer responded to dispatch by asking, "Who's held up inside Reggy [Reginald] or Andre [Thompson]?" (Docket Entry # 69-1). Dispatch responded by stating, "No Reggy [Reginald], the shooter, I'll find out as soon as she [Burton] gets here. Seal it [the building] off until she gets here and I'll let you know." (Docket Entry 69-1).

Turning to the police reports, Kramer did not report that dispatch told him where Reginald went after the shooting. (Docket Entry # 63-4, p. 3). Instead, Kramer's report states

that, "It is known that Reginald Jenkins lives at and has been observed at 112 High Street on a daily basis." (Docket Entry # 63-4, p. 3). Skwarto's police report states that, "I am further aware that Reginald . . . has an active warrant for his arrest . . . listing an address of 112 High St." (Docket Entry # 63-4, p. 11). Schlageter's police report reflects that, "Dispatcher . . . gave an update that . . . Reginald Jenkins was the shooter and that he fled the area in an *unknown direction*." (Docket Entry # 63-4, p. 16) (emphasis added).

4.   Immediately before Police Entry into Building

In response to the dispatch, Bolton and Skwarto were the first police officers to arrive at the building, followed by Schlageter, Kramer, Martin, and Brady thereafter (collectively "responding officers"). (Docket Entry # 63, ¶¶ 16-17) (Docket Entry # 69, ¶¶ 16-17) (Docket Entry # 60-13, ¶ 19). When Skwarto arrived at the building, he encountered Reginald Jr. who was "emerging from around the side of the Allan M. Walker Insurance building" and, according to Skwarto's police report, stated that "'something happened with my dad, I'm going in the house [the building] to see if everything is ok.'"[4] (Docket Entry # 63-4, p. 10-11). Reginald Jr. "continued toward 112

---

[4]   The above statement is not considered for the truth of the matter asserted, namely, that "'something happened with'" Reginald Jr.'s father.

High St." and Skwarto accompanied him.  (Docket Entry # 63-4, p. 11).

Schlageter then arrived at the building and observed Reginald's teenage son (Reginald Jr.) standing in the parking lot of a business on High Street.  (Docket Entry # 63, ¶ 20) (Docket Entry # 69, ¶ 20).  Thereafter, Schlageter "looked to the third floor of 112 High Street" and "saw several people looking out the window."  (Docket Entry # 63-4, p. 16-17).  When Kramer arrived at the scene, he reported observing "Skwarto walking with Reginald Jenkins [Jr.] in the parking lot of Alan Walker Insurance."  (Docket Entry # 63-4, p. 3).  Kramer also reported that, "Rosemary Jenkins and several children were observed to be looking out of the second floor apartment and yelling out to officers."[5]  (Docket Entry # 63-4, p. 4).  None of the responding officers observed any ongoing altercation or Reginald fleeing the building.  (Docket Entry # 63, ¶¶ 16-17, 24) (Docket Entry # 69, ¶¶ 16-17, 24).

From plaintiff's perspective, about 30 minutes prior to the police arriving, plaintiff left her apartment and told the children inside to lock the door.  (Docket Entry # 60-2, p. 73).  She then sat outside in the driveway adjacent to the property

---

[5]  Kramer's report is mistaken on this fact.  Plaintiff lives in apartment three, which is located on the third floor of the building.  (Docket Entry # 63, ¶ 3) (Docket Entry # 69, ¶ 3).

alone until the police arrived.  (Docket Entry # 60-2, p. 77-78).

5.  Entering Plaintiff's Apartment

After all of the responding officers arrived at the building, they decided to enter the building and search for Reginald.  (Docket Entry # 63-4, pp. 5, 11, 17).  Skwarto stated that, "when the [responding officers] entered the common area of the building[,] they observed Plaintiff exit her apartment and lock the door behind her."  (Docket Entry # 63, ¶ 25) (Docket Entry # 69, ¶ 25).  At plaintiff's deposition, however, plaintiff testified that she was outside the building when the police arrived.[6]  (Docket Entry # 60-2, p. 80).  Skwarto asked plaintiff if Reginald was in the apartment, to which she responded, "'You guys ain't going in.'"  (Docket Entry # 63, ¶ 26) (Docket Entry # 69, ¶ 26).

Despite the fact that plaintiff did not give the responding officers permission to enter her apartment (Docket Entry # 63, ¶ 26) (Docket Entry # 69, ¶ 26), Skwarto kicked plaintiff's door and responding officers entered plaintiff's apartment with their weapons drawn, frightening plaintiff's grandchildren who were playing in the living room.  (Docket Entry # 63, ¶¶ 27-28) (Docket Entry # 69, ¶¶ 27-28).  As it turned out, Reginald was

---

[6]  The disputed fact is resolved in plaintiff's favor as the non-movant.

not inside plaintiff's apartment.  (Docket Entry # 63, ¶ 43)

(Docket Entry # 69, ¶ 43) (Docket Entry # 63-4, p. 12).

6.   <u>Activities Inside Plaintiff's Apartment</u>

Schlageter reported that, "'At some point, [plaintiff]

walked into the apartment and began to argue with Detective

Kramer.'"  (Docket Entry # 63, ¶ 31) (Docket Entry # 69, ¶ 31).

Schlageter also reported that, "'Kramer advised [the plaintiff]

to calm down several times'" and that she "'refused to calm down

and was placed under arrest.'"  (Docket Entry # 63, ¶ 31)

(Docket Entry # 69, ¶ 31) (Docket Entry # 63-4, p. 19).  At no

point in Schlageter's report did he state that plaintiff made

"'contact'" with Kramer.  (Docket Entry # 63, ¶ 31) (Docket

Entry # 69, ¶ 31).

According to Skwarto's police report, plaintiff "'was still

yelling, directing her anger at Detective Kramer.  She

continually followed him around preventing him from performing

his duty . . . [plaintiff] made contact with Detectives [the

responding officers] numerous times during her tirade and

subsequently, after at least a dozen warnings that [he] issued

her, she was placed in handcuffs.'"  (Docket Entry # 63, ¶ 29)

(Docket Entry # 69, ¶ 29).  At her deposition, plaintiff stated

that she went into her kitchen and then bedroom to get her phone

during this time.  In response to the handcuffing of her

grandson, plaintiff asked the responding officers, "'Why they doing him like that?'" (Docket Entry # 60-2, pp. 99, 120).

At her deposition, plaintiff stated that Kramer did not have contact with her prior to her being handcuffed. (Docket Entry # 60-2, p. 121). Plaintiff also testified at her deposition, that, an unidentified police officer shoved her to prevent her from entering her bedroom. (Docket Entry # 60-2, pp. 108-09). More specifically, Kramer hit plaintiff in the back and she fell to her knees striking a living room couch. (Docket Entry # 60-2, pp. 121-122) (Docket Entry # 60, ¶ 38).[7] Kramer did not say anything prior to arresting plaintiff. (Docket Entry # 60-2, pp. 120-121). Kramer then placed the handcuffs on plaintiff while plaintiff's knees were on the floor and her face was on the couch, according to plaintiff's deposition testimony. (Docket Entry # 60-2, p. 121). Plaintiff also testified that her hands were behind her back when she was handcuffed. (Docket Entry # 60-2, p. 129). After placing the handcuffs on plaintiff, Kramer lifted plaintiff up (Docket Entry # 60-2, p. 121) and started to escort her out the door. (Docket Entry # 60-2, p. 124). Plaintiff stated that before and during the handcuffing, she did not sustain an injury. (Docket Entry # 60-2, p. 123).

---

[7] Plaintiff does not controvert paragraph 38 of defendants' LR. 56.1 statement. <u>See</u> LR. 56.1.

Plaintiff also testified at her deposition that, after she was handcuffed, Kramer "drug [sic] me out . . .," and "was pulling me . . .." (Docket Entry 60-2, p. 125). Plaintiff did not fall or sustain an injury when Kramer escorted her downstairs. (Docket Entry # 60-2, p. 129). Plaintiff testified that, after she came outside and while in the parking lot, Kramer took her wrists and "grinded" them together inside her handcuffs, causing her pain. (Docket Entry # 63, ¶ 34) (Docket Entry # 69, ¶ 34). Except for Kramer and the officer who shoved plaintiff, no other responding officer used any force against plaintiff. (Docket Entry # 60-2, pp. 144-45).

Plaintiff also testified that, as she was escorted out of her apartment, roughly 15 to 20 people gathered to watch. (Docket Entry # 60-2, pp. 136-37). Except for an individual who lived in the house next door, plaintiff did not recognize any of these people. (Docket Entry # 60-2, pp. 137-39). She also did not know if anyone was a neighbor. (Docket Entry # 60-2, pp. 137-39). In addition to plaintiff's arrest, Reginald Jr. was arrested. (Docket Entry # 60-2, p. 124).

7.   After Plaintiff's Escort Out of Building

After plaintiff's escort out of the building and while waiting for transport to the Taunton police station, Domingo arrived and inquired about why plaintiff was being arrested. (Docket Entry # 63, ¶ 36) (Docket Entry # 69, ¶ 36). Members of

TPD refused to respond to Domingo's inquiries, stunned him with a Taser, and placed him under arrest. (Docket Entry # 63, ¶ 36) (Docket Entry # 69, ¶ 36). Thereafter, Kramer placed plaintiff into a cruiser and she was transported to the Taunton police station. (Docket Entry # 63, ¶ 37) (Docket Entry # 69, ¶ 37). While at the Taunton police station, plaintiff complained of wrist pain and requested medical treatment. (Docket Entry # 63, ¶ 38) (Docket Entry # 69, ¶ 38). In response, plaintiff was transported to Morton Hospital where she was diagnosed with a contusion to her wrist. (Docket Entry # 63, ¶ 39) (Docket Entry # 69, ¶ 39). Plaintiff was discharged and did not seek any further medical treatment for her wrist. (Docket Entry # 60-2, p. 156).

8.  Reginald's Arrest

After the responding officers left the building, members of TPD went to 19 Union Street, which was approximately half a mile away from plaintiff's apartment where they arrested Reginald. (Docket Entry # 63, ¶ 48) (Docket Entry # 69, ¶ 48). Kramer stated that, "It is known that [Reginald] hangs out at 19 Union Street and is seen at the residence on many occasions." (Docket Entry # 63, ¶ 45) (Docket Entry # 69, ¶ 45). Skwarto stated that he, along with Kramer and Schlageter, "'proceeded to 19 Union St. due to the fact that we are aware that [Reginald] spends much of his time at this apartment with a Jay Wright.'"

(Docket Entry # 63, ¶ 46) (Docket Entry # 69, ¶ 46) (Docket
Entry # 63-4, p. 14). Schlageter stated that, "'The address of
19 Union Street is the address of Jay Wright and is an address
that is frequented by [Reginald].'" (Docket Entry # 63, ¶ 47)
(Docket Entry # 69, ¶ 47).

Reginald was subsequently indicted on multiple offenses
arising out of the August 2, 2013 shooting of Thompson and the
threatening of Burton with a firearm. (Docket Entry # 60-9).
He pled guilty to these offenses. (Docket Entry # 60-6, p. 18).

9. Arrest Warrant and Search Warrant

The responding officers did not have a warrant to search
plaintiff's apartment at the time of entry. (Docket Entry # 63,
¶ 40) (Docket Entry # 69, ¶ 40). The parties dispute whether
the police had a warrant for Reginald's arrest. (Docket Entry #
69, ¶¶ 41-42). Defendants produced a print out from the
Commonwealth of Massachusetts Criminal Justice Information
System website. (Docket Entry # 60-5). The print out bears the
title "WMS Warrant: JENKINS, REGINALD L" issued on August 1,
2013 and identifies "112 High Street, Taunton, MA 02780" as the
address. (Docket Entry # 60-5). By affidavit, Skwarto, a
detective in the TPD, attests that the warrant referred to in
the print out, WR4934980TC, is an arrest warrant for the charged
offense, i.e., assault and battery with a dangerous weapon
committed on July 31, 2013. (Docket Entry # 69, ¶ 5) (Docket

Entry # 60-5).  It also indicates a recall date of August 5,
2013 (Docket Entry # 60-5), which was three days after
Reginald's arrest.  (Docket Entry # 63-3, p. 54).  TPD's
database shows that a summons issued for Reginald on July 31,
2013.  (Docket Entry # 63-3, p. 54).

10.  Aftermath

    Skwarto, Kramer, and Schlageter each prepared a police
report regarding the August 2, 2013 incident which resulted in
the arrests of plaintiff, Reginald Jr., Domingo, and Reginald.
(Docket Entry # 63, ¶ 49) (Docket Entry # 69, ¶ 49).

    On August 3, 2013, Kramer applied for a criminal complaint
against plaintiff.  (Docket Entry # 60-10, p. 1).  The complaint
charges plaintiff with interference with a police officer under
Massachusetts common law; disorderly conduct under Massachusetts
General Laws chapter 272, section 53 ("section 53"); and
resisting arrest under Massachusetts General Laws chapter 268,
section 32B ("section 32B").  (Docket Entry # 60-10, p. 1).  The
criminal complaint attaches the police reports, including those
by Kramer and Skwarto.  (Docket Entry # 60-10, pp. 2-26).  The
criminal complaint does not attach Schlageter's report.  (Docket
Entry # 60-10).  A Clerk Magistrate at the Taunton District
Court found probable cause to issue each of the charges sought
against plaintiff based on the police reports attached by
Kramer.  (Docket Entry # 60-11).  On or about November 12, 2014,

an Associate Justice dismissed all three charges without
prejudice upon the request of plaintiff, i.e., defendant in the
criminal complaint. (Docket Entry # 63, ¶ 51) (Docket Entry #
69, ¶ 51) (Docket Entry # 60-12, p. 2).

DISCUSSION

I.  Counts I and IX

    Skwarto, Schlageter, Brady, Martin, Bolton, and Kramer move
for summary judgment on Count I based on an unreasonable search
under the Fourth and Fourteenth Amendments in violation of
section 1983 and the corresponding claim in Count IX based on
the MCRA.[8]  They seek summary judgment on these claims because:
(1) they were acting under a valid arrest warrant for Reginald;
and, in any event, (2) exigent circumstances excused the need
for a warrant.  In addition, they submit that their mistaken
belief that Reginald lived at 112 High Street was reasonable

---

[8]  Citing Sietins v. Joseph, 238 F.Supp.2d 366, 377-78 (D. Mass.
2003) (addressing Fourth Amendment section 1983 claims and
noting that, "MCRA is 'coextensive with 42 U.S.C. § 1983,
except'" as to state action requirement in section 1983 and
"'threats, intimidation or coercion'" requirement in MCRA), the
above defendants maintain that the MCRA claims in Count IX and
the corresponding to the section 1983 claims in Count I are
subject to summary judgment for the same reasons. (Docket Entry
# 59).  Plaintiff does not address the MCRA claims in her
opposition (Docket Entry # 62) and, for purposes of summary
judgment, therefore waives any argument that there is a
meaningful or material distinction between the two statutes with
respect to the claims in counts I and IX.  See Merrimon v. Unum
Life Ins. Co. of America, 758 F.3d 46, 57 (1st Cir. 2014); Coons
v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010);
Vallejo v. Santini-Padilla, 607 F.3d 1, 7 n.4 (1st Cir. 2010).

19

thereby entitling them to qualified immunity.[9]  Plaintiff

addresses the reasonable, but mistaken, belief that Reginald

resided at 112 High Street as relevant to an analysis under

Payton v. New York, 445 U.S. 573, 586 (1980), and United States

v. Graham, 553 F.3d 6, 12 (1st Cir. 2009).  She does not discuss

the reasonableness of the mistake vis-à-vis qualified immunity.

Plaintiff otherwise maintains there is not sufficient evidence

of an arrest warrant and that exigent circumstances did not

exist.

1.   Arrest Warrant and Reasonable Belief

Skwarto, Schlageter, Brady, Martin, Bolton, and Kramer

argue that they had a valid outstanding arrest warrant for

Reginald's arrest because the warrant lists the building as his

address and the responding officers had a reasonable belief that

Reginald lived in the apartment searched.  (Docket Entry 59, p.

3).  Plaintiff submits that defendants failed to produce an

arrest warrant signed by a judge or magistrate and therefore

maintains that defendants' argument fails.  (Docket Entry # 62

p. 3).

---

[9]  The aforementioned defendants seek qualified immunity only on
the basis of the officers' reasonable belief that Reginald lived
in apartment three and was inside apartment three at the time
they executed the arrest warrant which allowed them to lawfully
enter the apartment to search for Reginald.  (Docket Entry # 59,
pp. 4-6).

"[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" Payton v. New York, 445 U.S. at 585 (quoting United States v. United States District Court, 407 U.S. 297, 313 (1972)). It is therefore a "'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Id. at 586. This rule, however, is not absolute in a case where an arrest warrant is involved. Id. at 602-03. "[A]n arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Id. at 603. The standard is whether "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivations." Lucas v. City of Boston, No. 07-CV-10979-DPW, 2009 WL 1844288, at *15 (D. Mass June 19, 2009); Graham v. Connor, 490 U.S. 386, 397 (1989).

Plaintiff submits that defendants failed to produce an arrest warrant for Reginald Jenkins, which the responding officers relied upon to justify their entry into plaintiff's apartment. Defendants, however, produced a print-out document titled, "WMS Warrant: JENKINS, REGINALD L" which, by affidavit, constitutes the arrest warrant on which the responding officers relied. (Docket Entry # 60-5). More specifically, by

21

affidavit, Skwarto, attests that the warrant referred to in the print out, WR4934980TC, is an arrest warrant for the charged offense, i.e., assault and battery with a dangerous weapon committed on July 31, 2013.  (Docket Entry # 69, ¶ 5) (Docket Entry # 60-5).  Defendants also produced an "Application for Criminal Complaint," submitted to the Taunton District Court by Patrolman Jayson J. LaPlante on August 1, 2013 for Reginald Jenkins concerning an application for an arrest warrant for the charged offense, i.e., assault and battery with a dangerous weapon.[10]  (Docket Entry # 69-2).  According to the summary judgment record (Docket Entry # 60), only Skwarto had knowledge of the arrest warrant at the time of the incident.  (Docket Entry # 60-10, p. 17) (Docket Entry # 60-13, ¶ 18).  In light of the above, no reasonable finder of fact could conclude that no arrest warrant existed.  Rather, the evidence in the summary judgment record establishes that a valid arrest warrant for Reginald Jenkins existed at the time of the incident and that at least one of the responding officers had knowledge of it.

The existence of an arrest warrant does not alone justify the entry into apartment three where, as here, the officers entered the wrong home.  In particular, subsequent to <u>Payton</u>,

---

[10]  As explained below, the WMS warrant listed only 112 High Street whereas the application listed apartment four at 112 High Street as Reginald's address.  (Docket Entry ## 60-5, 69-2).

courts have held that, even where it is discovered after entry that the dwelling is not the suspect's home, the initial entry may be justified under Payton provided the police reasonably believed, prior to entry, that the suspect did reside at the dwelling. See United States v. Graham, 553 F.3d 6, 12 (1st Cir. 2009).

Whether a suspect actually "resided at a location, then, is not dispositive so long as the police 'reasonably believed' prior to entry that he (1) resided at the apartment and (2) would be present." United States v. Werra, 638 F.3d 326, 337 (1st Cir. 2011) ("Werra"); Graham, 553 F.3d at 12. In determining whether the officers possessed a reasonable belief that a suspect resided at a location, courts examine the basis for that belief, "examining 'the facts and circumstances within the knowledge of the law enforcement agents . . . viewed in the totality.'" Graham, 553 F.3d at 13 (quoting United States v. Bervaldi, 226 F.3d 1256, 1263 (11th Cir. 2000)).

"Reasonable belief is an objective standard." Commonwealth v. Gentile, 2 N.E.3d 873, 878 (Mass. 2014); see also Werra, 638 F.3d at 337 (stating that a reasonable officer must form an objectively reasonable belief that suspect lived at premises and was present at time of entry); see also Meuser v. Federal Express Corp., 564 F.3d 507, 520 (1st Cir. 2009) (applying objective standard of reasonable person for MCRA claim). A law

enforcement official's belief must be supported by "specific articulable facts" that, based on the totality of circumstances, permit a reasonable inference that, at the time of entry, the defendant is in the premises. Gentile, 2 N.E.3d at 878. Information concerning a reasonable belief of residence has been held to be, in totality, a prior police report listing the apartment as suspect's residence, a probation officer informing the police officer that the apartment was the suspect's residence, a person outside of the apartment informing the police officer that the suspect resided inside the apartment, a police officer noticing many known associates of the suspect on the porch of the apartment, and the police officer was unable to locate the subject of the arrest warrant at a location previously associated with the subject. Graham, 553 F.3d at 13-14; see United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996) (noting that police's inability to locate subject of arrest warrant at location previously associated with subject could support a reasonable belief that subject was residing at different location).

The court in Werra, considered the following relevant information possessed by the officers in assessing whether they had a reasonable belief that a suspect lived at a location: (1) an informant told the officers she had seen the suspect at an address recently and that the suspect was staying there; (2) the

informant previously provided officers with accurate information about the location of a suspect; (3) the officer was aware that the suspect was a drug abuser; (4) during the officer's previous visit to the location, he observed it was a "sober house with tenants living on the premises"; (5) and the officers arrived "relatively early in the morning, at approximately 10:00 a.m." 638 F.3d at 337. The court in Werra, however, doubted that this information was sufficient to support the first prong of the Payton inquiry, i.e., that the officers could reasonably believe that the suspect lived in the location "when they forced their way into it." Id. Further, a different home address appeared on the arrest warrant for the suspect in Werra and, even accepting that the suspect had stayed at the location "recently," the court explained that the officers neither conducted surveillance nor took any other steps to verify that the suspect's stay had not been temporary. Id.; see United States v. Clayton, 210 F.3d 841, 842-44 (8th Cir. 2000).[11]

The court in Clayton relied on a police record indicating that a defendant resided in a particular house in order to form a reasonable belief that the defendant resided at that location. Clayton, 210 F.3d at 842. The Clayton court nevertheless required more to find a reasonable belief of residence and

---

[11] The First Circuit in Werra and in Graham cite and rely on Clayton. See Graham, 553 F.3d at 13; Werra, 638 F.3d at 338.

stated that an anonymous caller informing police that the defendant resided at the house and that there was a possible methamphetamine laboratory, along with a person leaving the house telling police, immediately prior to entry, that the defendant was inside, was enough to give police a reasonable belief that the defendant resided at that location. Clayton, 210 F.3d at 842-44.

Here, the officers objectively recognized that plaintiff lived in apartment three of 112 High Street in Taunton, whereas TPD records refer to Reginald's address as either apartment four at 112 High Street or simply 112 High Street. (Docket Entry # 63, ¶¶ 2, 12) (Docket Entry # 69, ¶¶ 2, 12). Dispatch informed the officers that Reginald "was inside the apartment over there where he lives." (Docket Entry # 69-1). The print-out evidencing the arrest warrant identifies "112 High Street, Taunton, MA 02789" as Reginald's address. (Docket Entry # 60-5). TPD records do not designate Reginald's address as apartment three at 112 High Street, i.e., plaintiff's apartment. (Docket Entry # 63-3, pp. 6, 29, 54, 57, 58, 60). In addition to a May 24, 2013 TPD incident report and the previously noted July 12 and 31 TPD incident reports all listing Reginald's address as 112 High Street, a booking report (#TTAU201300787) dated May 1, 2013 lists Reginald's address under "Basic Information" as "112 HIGH ST 4 TAUNTON MA 02780." (Docket Entry

# 63-3, p. 32).  (Docket Entry # 63-3, p. 6).  A TPD incident
report (# 13005575) dated March 22, 2013 lists Reginald's
address under "Correct Location" as "112 HIGH ST #4" and under
"Apartment #" as "4."  (Docket Entry # 63-3, p. 29).  A rap
sheet as of August 2, 2013 on Reginald kept by TPD twice lists
Reginald's address as "112 HIGH ST 4 TAUNTON MA 02780" as his
current (Docket Entry # 63-3, p. 54) and most recent (Docket
Entry # 63-3, p. 57) address.  A document titled "Master Person
#: 300008470" lists Reginald's address as "112 HIGH ST 4" with
an entry date of May 1, 2013.  (Docket Entry # 63-3, pp. 58-60).
Finally, the application for the criminal complaint concerning
the arrest warrant for Reginald Jenkins submitted in Taunton
District Court on August 1, 2013 lists Reginald's address as
"112 HIGH ST 4 TAUNTON MA 02780."  (Docket Entry # 69-2).  Thus,
in comparison to the information held by the officers in Graham
and Clayton, the information held by the responding officers is
significantly weaker.  Whereas these cases had additional facts
that the defendant resided in the residence at issue; here, a
reasonable factfinder could readily find in favor of plaintiff
that the responding officers did not have a reasonable basis in
their purported belief that Reginald lived in apartment three.
See Green Mountain Realty Corp. v. Leonard, 750 F.3d 30, 38 (1st
Cir. 2014).

Examining the second requirement, namely, the responding officers' reasonable belief that Reginald was present inside apartment three, Skwarto avers that the "radio communication to all police officers also stated that . . . Reginald Jenkins Sr. went inside his apartment at 112 High Street after the shooting." (Docket Entry # 60-13, ¶ 15). As the foregoing TPD records evidence, Reginald's apartment, if any, at 112 High Street was apartment four, not three. According to Schlageter's police report, dispatch "gave an update that . . . Reginald Jenkins was the shooter and that he fled the area in an unknown direction." (Docket Entry # 63-4, p. 16). Where, as here, "law enforcement authorities are cooperating in an investigation[,] . . . the knowledge of one is presumed shared by all.'" Solis-Alarcón v. United States, 662 F.3d 577, 581 (1st Cir. 2011) (quoting Illinois v. Andreas, 463 U.S. 765, 771 n.5 (1983)); see United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997). According to Skwarto's affidavit, his knowledge is based on a radio communication by TPD dispatch that stated Burton, the victim's mother, indicated to the TPD that Reginald went inside his apartment at 112 High Street after the shooting. (Docket Entry # 60-13, ¶ 15). The dispatch recording states, "We are looking for Reggy Jenkins [Reginald], he just shot at Burton's son and she watched him do it." (Docket Entry # 69-1). The dispatch recording informed the responding officers that "he's

(Reginald) inside the apartment over there where he lives," and to "seal it off until she (Burton) gets here (the TPD station) and I'll let you know," referring to informing the responding officers of Burton's statements once she arrived at the police station. (Docket Entry # 69-1). According to Detective Shawn Mulhern's police report, Burton stated that Reginald "backed up and fired two more rounds and then ran off," not indicating if Reginald fled into any building or location. (Docket Entry # 60-10, p. 13). Based on the foregoing, a reasonable factfinder could find in favor of plaintiff that the responding officers lacked a reasonable belief that after the shooting Reginald fled into plaintiff's apartment. <u>Leonard</u>, 750 F.3d at 38. Summary judgment that the officers made a lawful entry into apartment three with an arrest warrant based on a reasonable belief of residence and a reasonable belief of Reginald's presence inside is not warranted.[12]

2.  <u>Exigent Circumstances</u>

Skwarto, Schlageter, Brady, Martin, Bolton, and Kramer alternatively argue that, even if they were aware that Reginald did not live in apartment three and were not acting pursuant to a warrant for his arrest, they were justified in conducting a

---

[12]  Qualified immunity relative to the reasonable belief of residence and reasonable belief that Reginald was inside apartment three is addressed under Roman numeral I(3) infra.

warrantless entry into and search of plaintiff's apartment "due
to the exigent circumstances present at the time." (Docket
Entry # 59, p. 7). Plaintiff argues that the facts do not
demonstrate a "'compelling necessity for immediate action [as
will] not brook the delay of obtaining a warrant'" and that
defendants have not proved that exigent circumstances existed.
(Docket Entry # 62, p. 3).

The Fourth Amendment protects individuals "against
unreasonable searches and seizures" and, under this standard,
warrantless searches of private premises are presumptively
unreasonable. United States v. Almonte-Báez, 857 F.3d 27, 31
(1st Cir. 2017). As explained in Almonte-Báez, "To secure the
admission of evidence obtained without a warrant, the government
must show that the warrantless search fell within one of a
handful of narrowly defined exceptions," such as the exception
for exigent circumstances. Id.

The exigent circumstances "exception generally requires a
threshold showing that law enforcement officers had probable
cause to enter the premises." Id. "[P]robable cause exists
when the totality of the circumstances create 'a fair
probability that . . . evidence of a crime will be found in a
particular place.'" Id. The assessment of probable cause is
made in light of what the responding officers knew at the time
they effected the warrantless entry. Id. at 32. A finding of

probable cause does not require proof beyond a reasonable doubt, rather, "it requires proof adequate to ground an objectively reasonable belief that evidence of a crime is likely to be found in the premises to be entered." Id.; see United States v. Floyd, 740 F.3d 22, 32 (1st Cir. 2014). In Almonte-Báez, probable cause was found to enter a residence based on the facts that agents knew the suspect rented the apartment to be searched, they observed the suspect carrying trash bags full of money out of the apartment, the suspect was a known drug dealer, and agents listened to wiretap intercepts detailing drug shipments to be made. Almonte-Báez, 857 F.3d at 32. Here, a reasonable factfinder could readily find in favor of plaintiff that the responding officers did not have probable cause to enter plaintiff's apartment after the shooting because of their lack of knowledge of Reginald's whereabouts and weak evidence that he was in apartment three, as opposed to apartment four.

In the alternative, assuming the existence of probable cause to enter plaintiff's apartment, defendants must still prove that there were exigent circumstances. Id. at 31. "To show exigent circumstances, the police must reasonably believe that 'there is such a compelling necessity for immediate action as will not brook the delay of obtaining a warrant.'" Id. "The government bears the burden of proving exigent circumstances." United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005).

"[E]xigent circumstances" commonly include: "(1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to an occupant." United States v. Tilbolt, 72 F.3d 965, 969 (1st Cir. 1995) (internal quotation marks omitted); see Matalon v. Hynnes, 806 F.3d 627, 636 (1st Cir. 2015). "The 'exigent circumstances' inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." Tilbolt, 72 F.3d at 969.

"Officers must be able to point to specific facts in the record to justify a warrantless entry based on exigent circumstances." DeMayo v. Nugent, 517 F.3d 11, 17 (1st Cir. 2008). "Hot pursuit" has been defined as some sort of chase, although it need not be an extended "hue and cry" in and about the public streets; however, the pursuit must be immediate or relatively continuous to justify the failure to secure a warrant. United States v. Soto-Beníquez, 356 F.3d 1, 36 (1st Cir. 2003); United States v. Baldacchino, 762 F.2d 170, 176 (1st Cir. 1985). Viewing the record in plaintiff's favor, as required, the police reports by the responding officers allow a reasonable fact finder to conclude that the responding officers were not in an active hot pursuit of Reginald because, when they

arrived on scene, they were not aware of the location of
Reginald, nor did they know in which direction he had fled.
(Docket Entry # 63-4, pp. 4, 11-12, 16); cf. Soto- Beníquez, 356
F.3d at 35-36 (holding that police were justified under hot
pursuit doctrine in following defendant into house because
defendant was observed carrying a firearm and ran from police
when defendant noticed police presence and the officer observed
him run into house).  On the other hand, the officers were
responding to a shooting and a suspect, Reginald, fleeing.
(Docket Entry # 63, ¶¶ 14-15) (Docket Entry # 69, ¶¶ 14-15).
Based on their collective knowledge, they knew he may have gone
into his apartment, based on the dispatch radio communication of
Burton's report that he went inside his apartment, which a
number of records identified as apartment four at 112 High
Street.  (Docket Entry # 69-1).  On balance and based on all of
the circumstances viewed in plaintiff's favor, a reasonable fact
finder could conclude that the responding officers were no
longer in hot pursuit of Reginald at the time they entered
plaintiff's apartment.

The responding officers next argue that the risk of
Reginald washing away gunshot residue and the victim's blood
from his hands or clothes during the time necessary to secure a
warrant was compelling to justify entering plaintiff's
apartment.  (Docket Entry # 59, p. 10).  "To show exigent

circumstances, the police must reasonably believe that there is such a compelling necessity for immediate action . . . like when delay would risk the destruction of evidence." Belsito Communications, Inc. v. Decker, 845 F.3d 13, 24-25 (1st Cir. 2016) (internal quotation marks omitted). Caselaw requires "that the police have an objectively reasonable basis for believing that evidence destruction is likely to occur." Id. For example, the court in "Samboy concluded that exigent circumstances permitted a warrantless entry into a suspected drug dealer's apartment because what the officers did—'knocking and announcing their presence'—'gave rise to a reasonable belief' that the dealer 'probably would have realized' that the law was 'closing in and begun disposing of the evidence.'" Id. at 25 (quoting Samboy, 433 F.3d at 158-59).

Here, viewing the record in plaintiff's favor, the responding officers did not know the location of Reginald after the shooting. The circumstances do not sufficiently evidence that Reginald was inside apartment three. At most, the officers had specific facts he resided in apartment four and, in light of Burton's report communicated by dispatch, he may have been inside apartment four perhaps washing his hand or clothes.

Thus, viewing the record in plaintiff's favor, the responding officers were not aware of the direction in which Reginald fled, as evidenced by the police reports by Skwarto,

34

Kramer and Schlageter. (Docket Entry # 63-4, pp. 4, 11-12, 16).
In addition, TPD's records indicated that Reginald resided in
apartment four, not plaintiff's apartment, i.e., apartment
three, or simply 112 High Street. Viewing the evidence in
plaintiff's favor, the responding officers did not know
Reginald's whereabouts after the shooting and lacked specific
facts that he was inside apartment three at the time they
entered that apartment. The first three scenarios of exigent
circumstances do not warrant summary judgment based on exigent
circumstances.

As to the fourth scenario, defendants argue that many small
children lived in the building and therefore immediate entry
into plaintiff's apartment was necessary in order to remove the
threat to the minor children posed by Reginald. (Docket Entry #
59, p. 9). "An officer's reasonable belief that the delay
needed to obtain a warrant would pose 'a threat to police or the
public safety' is sufficient to create exigent circumstances."
Fletcher v. Town of Clinton, 196 F.3d 41, 49 (1st Cir. 1999)
(emphasis omitted). In light of the foregoing disputed facts as
to Reginald's location and the weak showing that Reginald was
inside apartment three, the concern for the safety of the
children in the area does not warrant summary judgment based on
the threat to the safety of children in the area.

Defendants heavily rely on Commonwealth v. Figueroa in arguing that exigent circumstances existed to justify a warrantless entry and search of plaintiff's apartment. Commonwealth v. Figueroa, 9 N.E.3d 812, 820 (Mass. 2014); (Docket Entry # 59, pp. 8-11). In Figueroa, the police had probable cause to believe that the shooter was present at 59 Salem Street because, at the time of entry, the police were aware that a man who bore a resemblance to the shooter told a taxicab driver to take him to 59 Salem Street. Id.

In the case at bar, however, defendants have not produced sufficient evidence to merit summary judgment showing that Reginald was inside apartment three at the time they entered the apartment. What convinced Kramer to enter and search plaintiff's apartment was merely that, "It is known that Reginald Jenkins lives at and has been observed at 112 High Street on a daily basis." (Docket Entry # 63-4, p. 3). The objective evidence supporting this knowledge consisted of a number of police records that identify apartment four, not three. What convinced Skwarto to enter and search plaintiff's apartment was that he observed Reginald Jr. walking towards the direction of 112 High Street, a multi-unit building, and police records designated apartment four as Reginald's address. (Docket Entry # 63-4, pp. 10-11). Skwarto also was aware of the active arrest warrant for Reginald that listed 112 High Street

as his address, however, it lists Reginald's address as "112
HIGH ST 4 TAUNTON MA 02780," and not apartment three. (Docket
Entry # 60-13, ¶ 18) (Docket Entry # 69-2). What convinced
Schlageter, who entered later, to enter plaintiff's apartment,
was that, "[b]ecause the shooting occurred in close proximity to
Ms. Jenkins [sic] residence, Detective Sergeant Skwarto,
Detective Kramer and I believed that Reginald Jenkins may be
hiding in his mothers [sic] apartment." (Docket Entry # 63-4,
p. 17). In contrast to Figueroa, where the police knew where
the shooter directed the taxicab driver to drive to, the
responding officers had only some information about the
direction in which Reginald fled after the shooting, based on
dispatch that he was "inside the apartment over there where he
lives" and that he was "inside his apartment over there right
now." (Docket Entry # 69-1). Defendants' reliance on Figueroa
regarding exigent circumstances is therefore misplaced. In sum,
defendants are not entitled to summary judgment on exigent
circumstances on Counts I and IX.

3.  Qualified Immunity as to Reasonable Belief of Residence

     Asserting a qualified immunity defense, Skwarto,
Schlageter, Brady, Martin, Bolton, and Kramer seek to dismiss
the section 1983 and MCRA claims in counts I and IX based on
their reasonable belief that the apartment was Reginald's
residence and their reasonable belief that Reginald was inside

37

that apartment.  (Docket Entry # 59, pp. 4-6).  Plaintiff does not address the argument in her brief.  (Docket Entry # 62).

"'Qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  MacDonald v. Town of Eastham, 745 F.3d 8, 11 (1st Cir. 2014) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)).  The doctrine affords "breathing room" to government officials "to make reasonable but mistaken judgments about open legal questions."  Id.  The doctrine does not protect public officials "who, 'from an objective standpoint, should have known that their conduct was unlawful.'"  Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir. 2013); Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).

The analysis is twofold.  Pearson v. Callahan, 555 U.S. at 816; see Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  Courts must decide "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was clearly established at the time of the defendant's alleged violation."  Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (internal quotation marks omitted); Maldonado, 568 F.3d at 269. These two steps "need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a

qualified immunity defense." Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010); accord Rivera-Sánchez, 715 F.3d at 9 ("federal courts have discretion to administer" the "test in the order that they determine will best facilitate the fair and efficient disposition of each case.").

The second prong entails ascertaining "(a) the clarity of the law in general at the time of the alleged violation; and (b) the clarity of the law as applied to the case—in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the plaintiff's constitutional rights.'" Pietroski, 623 F.3d at 36; see Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011). The latter aspect is "'undertaken in light of the specific context of the case, not as a broad general proposition.'" Rivera-Sánchez, 715 F.3d at 9; Brosseau v. Haugen, 543 U.S. 194, 198 (2004). The dispositive inquiry "is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." Rivera-Sánchez, 715 F.3d at 9; see Gericke v. Begin, 753 F.3d 1, 5-6 (1st Cir. 2014) (task determines whether "law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional").

Summary judgment relative to qualified immunity presents "an inherent tension" because the latter "requires absolute

deference to the nonmovant's" facts whereas qualified immunity
"demands deference to the reasonable, if mistaken, actions of
the movant."  Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir.
2009).  Courts are instructed to "cabin these standards and keep
them logically distinct, first identifying the version of events
that best comports with the summary judgment standard and then
asking whether, given that set of facts, a reasonable officer
should have known that his actions were unlawful."  Id. at 19.
In identifying that version of events, the summary judgment
facts and reasonable inferences drawn therefrom are viewed in
plaintiff's favor.  See Campos v. Van Ness, 711 F.3d 243, 245
(1st Cir. 2013) (when "parties tell two different stories, as is
the case here, we typically must view the facts and draw all
reasonable inferences in the non-movant's favor").  Plaintiff's
factual assertions must nonetheless be "put forward on personal
knowledge or otherwise documented by materials of evidentiary
quality."  Morelli, 552 F.3d at 18-19.  When the record
blatantly contradicts plaintiff's version, "a court should not
adopt that version of the facts for purposes of ruling on a
motion for summary judgment."  Campos, 711 F.3d at 245.

Here, the version of events includes that the officers had
an arrest warrant for Reginald listing an address of 112 High
Street.  Drawing reasonable inferences in plaintiff's favor,
they knew that plaintiff lived in apartment three on the third

floor of 112 High Street.  Although plaintiff lived in apartment three at 112 High Street, the majority of TPD records refer to Reginald's address as apartment four and otherwise refer to simply 112 High Street.  None of the records list Reginald's apartment as number three.  (Docket Entry # 63, ¶ 2) (Docket Entry # 69, ¶ 2).  The dispatch recording informed the responding officers that, "he's [Reginald] inside the apartment over there where he lives," and to "seal it off until she [Burton] gets here [the TPD station] and I'll let you know," referring to informing the responding officers of Burton's statements once she arrived at the police station.  (Docket Entry # 69-1).  As discussed above and viewing the evidence in favor of plaintiff, the responding officers did not know Reginald's whereabouts after the shooting and lacked specific facts that he was inside apartment three at the time they entered that apartment.

For reasons previously explained, the facts make out a violation of plaintiff's right to be free from an unreasonable search and seizure under the Fourth Amendment.  For purposes of the second step of the analysis, whether the right in question was "clearly established" depends on:  "(a) whether the legal contours of the right in question were sufficiently clear that a reasonable [official] would have understood that what he was doing violated the right, and (b) whether in the particular

factual context of the case, a reasonable [official] would have understood that his conduct violated the right." Tavares v. Gelb, No. 15-CV-130000-FDS, 2016 WL 6518428, at *6 (D. Mass. Nov. 2, 2016) (quoting Mlodzinski v. Lewis, 648 F.3d 24, 32-33 (1st Cir. 2011)).  To examine whether a right was "'clearly established'" at the time the complained of conduct occurred, the court should "'examine not only Supreme Court precedent, but all available case law . . . including both federal cases outside [the First Circuit] . . . and state court decisions of the state wherein the [officials] operated.'" Tavares, 2016 WL 6518428, at *6 (quoting Wilson v. City of Boston, 421 F.3d 45, 56-57 (1st Cir. 2005)).  The question is not whether some right has been clearly established at a highly abstract level, but "'whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.'" Tavares, 2016 WL 6518428, at *6 (quoting McBride v. Taylor, 924 F.2d 386, 389 (1st Cir. 1991)); see also Hope v. Pelzer, 536 U.S. 730, 741 (2002) (officials can still be on notice that their conduct violates established law even in novel factual circumstances).

Turning to the clearly established law, Payton and Graham articulate the clearly established law in circumstances involving entry into the wrong dwelling that is not the

residence of the target of the arrest warrant.  Payton sets out
the overarching law that police with an arrest warrant "may
enter the dwelling of [the] suspect when 'there is reason to
believe [he] is within.'"  Graham, 553 F.3d at 12 (quoting
Payton, 445 U.S. at 602).  Where, as here, the police discover
"after entry that the dwelling *is not* the suspect's, the initial
entry may be justified under *Payton* provided the police
reasonably believed, prior to entry, that the suspect *did* reside
at the dwelling."  Id.  Thus, at a less abstract level, the
determinative inquiry is whether "the police 'reasonably
believed' prior to entry that [the suspect] (1) resided at the
apartment and (2) would be present."  Id.; accord Werra, 638
F.3d at 337.

Reducing the inquiry from the foregoing abstract law, as
previously stated Graham establishes the following as satisfying
a reasonable belief of residence:  a prior police report listing
the apartment as suspect's residence, a probation officer
informing the police officer that the apartment was the
suspect's residence, a person outside of the apartment informing
the police officer that the suspect resided inside the
apartment, a police officer noticing many known associates of
the suspect on the porch of the apartment, and the police
officer was unable to locate the subject of the arrest warrant
at a location previously associated with the subject.  Graham,

553 F.3d at 13-14.  <u>Clayton</u> sets out the following as sufficient to satisfy a reasonable belief of residence:  an anonymous caller stating that the defendant resided at a particular house (and that the house contained a methamphetamine lab), a computer search by a detective verifying the address, and a person leaving the house telling the officers that the suspect was inside.  <u>Clayton</u>, 210 F.3d at 842-844; <u>see</u> <u>Graham</u>, 553 F.3d at 13 (discussing <u>Clayton</u>).

In the case at bar, the legal contours of the law in August 2013 would have given a reasonable police officer clear notice that he lacked a reasonable belief that Reginald resided in apartment three at 112 High Street.  The majority of the police records identified Reginald's address as apartment four and otherwise as 112 High Street.  TPD officers knew that plaintiff lived in apartment three of a multi-unit apartment building.  Dispatch transmissions that the victim's mother said Reginald was inside "his apartment over there" do not mention the 112 High Street address let alone apartment three.  Considering these and other facts in the record, qualified immunity is lacking with respect to a reasonable belief of residence.  It is therefore not necessary to examine qualified immunity vis-à-vis whether the officers had a reasonable belief Reginald was inside apartment three.

4.  <u>Fourteenth Amendment Substantive Due Process Claim</u>

Kramer, Skwarto, and Schlageter next assert that the entry and search of plaintiff's apartment was lawful and did not rise to the level of "conscience-shocking" conduct which is "necessary to support a due process claim under the Fourteenth Amendment." (Docket Entry # 59, p. 12). Thus, the due process claim in Count I is subject to dismissal, according to the defendants. Plaintiff does not address this argument in her brief. (Docket Entry # 62).

"Substantive due process is a constitutional cause of action that leaves the door 'slightly ajar for federal relief in truly horrendous situations.'" Clark v. Boscher, 514 F.3d 107, 112 (1st Cir. 2008) (quoting Nestor Colón-Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 45 (1st Cir. 1992)). When a plaintiff's substantive due process claim challenges "the constitutionality of certain executive acts, 'the plaintiff must show *both* that the acts were so egregious as to shock the conscience *and* that they deprived him of a protected interest in life, liberty, or property.'" Harron v. Town of Franklin, 660 F.3d 531, 536 (1st Cir. 2011) (quoting Pagan v. Calderon, 448 F.3d 16, 32 (1st Cir. 2006)). As explained in Harron, although not "a rigid two-step analysis," the court "typically" first examines "whether the acts alleged were conscience-shocking." Harron, 660 F.3d at 536; see Martinez v. Cui, 608 F.3d 54, 64 (1st Cir. 2010).

"There is no scientifically precise formula for determining whether [an official's] action is-or is not-sufficiently shocking to trigger the protections of the substantive due process branch of the Fourteenth Amendment." Pagan, 448 F.3d at 32. Executive acts that shock the conscience, however, must be "'truly outrageous, uncivilized, and intolerable,'" and "'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error.'" Harron, 660 F.3d at 536. "[A] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience.'" Id. (quoting González-Fuentes v. Molina, 607 F.3d 864, 881 (1st Cir. 2010)).

"[T]he requisite inquiry involves 'a comprehensive analysis of the attendant circumstances before any abuse of official power is condemned as conscience-shocking.'" Pagan, 448 F.3d at 32. Courts have held, for example, "in situations 'where government officials must act in haste, under pressure, and without an opportunity for reflection, even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically for the very

purpose of causing harm.'" Molina, 607 F.3d at 881.

Conscience-shocking conduct has been usually held to entail

"physical or psychological abuse, or significant interference

with a protected relationship, such as the parent-child

relationship." McConkie v. Nichols, 446 F.3d 258, 261 (1st Cir.

2006). Other examples of conscience-shocking conduct "include

the intentional framing of innocent citizens for serious crimes

they did not commit . . . and cases involving 'extreme or

intrusive physical contact.'" DePoutot v. Raffaelly, 424 F.3d

112, 119 (1st Cir. 2005) (quoting Souza v. Pina, 53 F.3d 423,

427 (1st Cir. 1995)); see Limone v. Condon, 372 F.3d 39, 44-45

(1st Cir. 2004). The First Circuit has "found no substantive

due process liability in situations in which law enforcement

officers committed reprehensible but less egregious acts, such

as deliberately shoving a pedestrian . . . or participating in

reckless high-speed car chases resulting in fatalities."

DePoutot, 424 F.3d at 119; see Cummings v. McIntire, 271 F.3d

341, 345 (1st Cir. 2001).

Here, although the issue is close, a reasonable finder of

fact could find that the responding officers' actions were

physically invasive and abusive and struck at plaintiff's basic

right to be free from an unreasonable search and seizure. See

Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 624 (1st Cir.

2000). As discussed above, the responding officers did not know

the location of Reginald as they entered plaintiff's apartment or, more specifically that he resided in and was located in apartment *three*, thereby making the responding officers' conduct physically intrusive and unreasonable.  See id.  Plaintiff did not give the responding officers permission to enter her apartment.  (Docket Entry # 63, ¶ 26) (Docket Entry # 69, ¶ 26).  Skwarto kicked in plaintiff's door and the responding officers entered plaintiff's apartment with their weapons drawn, frightening plaintiff's grandchildren who were playing in the living room.  (Docket Entry # 63, ¶¶ 27-28) (Docket Entry # 69, ¶¶ 27-28).  Plaintiff also testified that an unidentified police officer shoved her to prevent her from entering her bedroom.  (Docket Entry # 60-2, pp. 108-09).  Plaintiff testified that, after she was brought outside in handcuffs and while in the parking lot, Kramer took her wrists and "grinded" them together inside her handcuffs, causing her pain.  (Docket Entry # 63, ¶ 34) (Docket Entry # 69, ¶ 34).  Although a close call, defendants' argument therefore fails.

As a final matter relative to the substantive due process claim, it is well settled that, "[S]ubstantive due process is an inappropriate avenue of relief when the governmental conduct at issue is covered by a specific constitutional provision." Fontanez v. City of Worcester, No. 09-cv-40203-FDS, 2012 WL 2829613, at *6 (D. Mass. July 9, 2012); (citing Pagan, 448 F.3d

at 33, and Graham, 490 U.S. at 395).  "When a specific provision

of the Constitution protects individuals against a particular

kind of [misconduct] by government actors, individuals seeking

redress . . . must assert their claims under that particular

constitutional rubric instead of invoking the more generalized

notion of substantive due process."  S. County Sand & Gravel Co.

v. Town of S. Kingstown, 160 F.3d 834, 835 (1st Cir. 1998).

Here, plaintiff contends that the responding officers violated

her substantive due process rights as well as the Fourth

Amendment by unlawfully searching her apartment without a

warrant.  (Docket Entry # 1, p. 4).  Because Kramer, Skwarto,

and Schlageter do not move for summary judgment based on the

foregoing principle, however, the due process claim remains in

this action at this juncture.

## II.   Count V

Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton

argue that plaintiff's failure to intervene claim in Count V

should fail.  (Docket Entry # 59, pp. 12-14).  They assert that

none of the responding officers had a reasonable opportunity to

prevent Kramer's alleged use of force or alleged unlawful

arrest.  (Docket Entry # 59, pp. 12-14) (Docket Entry # 70).

Plaintiff does not address the failure to intervene claim as

based on the use of excessive force.  Rather, she argues that

the responding officers had an opportunity to intervene by

preventing the other officers from entering her apartment and preventing the arrest from occurring. (Docket Entry # 62, p. 7). As pled, Count V alleges a failure to intervene "to prevent fellow officers from unreasonably searching the Plaintiff's apartment and using excessive and unreasonable force." (Docket Entry # 1, ¶ 48).

Assuming arguendo that Kramer used excessive force, the responding officers did not have a realistic opportunity to intervene. The record fails to show which responding officers, if any, were in a position to intervene to prevent Kramer's alleged use of force. Kramer's conduct gave no warning or indication that he was about to hit or push plaintiff in the back, knocking her to her knees. Kramer also did not say anything prior to arresting plaintiff. (Docket Entry # 60-2, p. 121). Rather, while she was still on her knees, he placed her in handcuffs and brought her outside away from the other responding officers still in the apartment. (Docket Entry # 60-2, pp. 129-31). Kramer then ground plaintiff's wrists together for a brief period of time and placed her in the police cruiser. (Docket Entry # 60-2, pp. 130-33). The brevity of the force exerted and the lack of any indication by Kramer concerning the force about to be used provides no basis to allow a reasonable fact finder to find that the other responding officers could have had a realistic opportunity to intervene. See Gaudreault

v. Salem, 923 F.2d 203, 207 n.3 (1st Cir. 2009); Calvi v. Knox Cty., 470 F.3d 422, 428 (1st Cir. 2006).

With respect to any failure to intervene claim based on preventing the arrest from occurring, Kramer gave little, if any, indication that he was about to arrest plaintiff once she fell to her knees. Notably, Kramer did not say anything prior to arresting her. Plaintiff's assertion in her opposition that "Skwarto ordered the plaintiff to be arrested" (Docket Entry # 62, p. 7) is not supported by any citation to the record. Plaintiff's LR 56.1 statement does not refer to Skwarto's order. The record otherwise fails to evidence that one or more of Kramer's fellow officers at the scene had a reasonable opportunity to intervene and prevent Kramer from placing plaintiff in handcuffs and arresting her.

In conclusion, a reasonable fact finder could not find that the responding officers had a realistic opportunity to intervene in the alleged excessive force or the arrest committed by Kramer. See Calvi, 470 F.3d at 428. The failure to intervene claims in Count V are therefore subject to summary judgment. Because defendants do not address the failure to intervene claim based on "unreasonably searching the Plaintiff's apartment," as pled in the complaint (Docket Entry # 1, ¶ 48), this claim remains in the case.

III.   Count VII

Count VII sets out a section 1983 conspiracy to violate plaintiff's constitutional "right to due process, to be free from unreasonab[le] search and seizures, and to be free from unreasonable and excessive force." (Docket Entry # 1, ¶ 54). In seeking summary judgment on this count, Brady, Kramer, Skwarto, Schlageter, Martin, and Bolton only argue that the record shows no evidence that the responding officers entered into a conspiratorial agreement to violate plaintiff's right to be free from excessive force.[13] (Docket Entry # 59, p. 14). Plaintiff argues that the responding officers agreed to enter plaintiff's apartment without a warrant. Plaintiff maintains that Skwarto also ordered Kramer to place plaintiff under arrest establishing a conspiratorial agreement to subject plaintiff to the use of excessive force. (Docket Entry # 62, pp. 6-7).

As commonly defined, a section 1983 conspiracy claim is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008); see Earle v.

---

[13]  The other conspiracy claims to violate plaintiff's right to due process and right to be free from an unreasonable search and seizure in Count VII therefore remain in this action.

Benoit, 850 F.2d 836, 844 (1st Cir. 1988).  For a conspiracy claim to be actionable under section 1983, the plaintiff must prove there has been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws. Benoit, 850 F.2d at 844.  Although "[c]onspiracy is a matter of inference, . . . summary judgment may still be appropriate on a conspiracy claim where the nonmoving party rests merely on conclusory allegations."  Wainwright, 548 F.3d at 178.

Here, there is an absence of sufficient evidence to create a genuine issue of fact to allow a reasonable fact finder to find a conspiratorial agreement.  The record does not support any further purpose beyond the responding officers' entry and search of plaintiff's apartment nor does it indicate an agreement between the responding officers to deprive plaintiff of the right to be free from the use of force.  Plaintiff testified that none of the responding officers said anything to her prior to entering her apartment.  (Docket Entry # 60-2, pp. 82-83, 89).  Plaintiff also testified that Kramer did not say anything prior to handcuffing her.  (Docket Entry # 60-2, pp. 121).  Nothing in the record demonstrates that Skwarto ordered Kramer to place plaintiff in handcuffs, as plaintiff alleges in her opposition.  (Docket Entry # 63, ¶¶ 29, 31) (Docket Entry # 69, ¶¶ 30-31).  Plaintiff simply presents no evidence of an agreement between the responding officers and the circumstantial

evidence of an agreement is speculative.  With the responding

officers pointing to the absence of evidence to support or

reasonably infer a conspiratorial agreement to deprive plaintiff

of her right to be free from the use of excessive force, it was

incumbent upon plaintiff as the summary judgment target with the

underlying burden of proof to present evidence to establish a

genuinely disputed material fact that the responding officers

entered into an agreement to use excessive force against her.

Summary judgment on the conspiracy to use excessive force claim

in Count VII is proper.

IV.  Count XII

Skwarto and Schlageter argue that the malicious prosecution

claim in Count XII is subject to summary judgment because it was

only Kramer who placed plaintiff under arrest and sought

criminal charges against her.  (Docket Entry # 59, pp. 14-17).

Plaintiff argues that Skwarto and Schlageter should not be

dismissed from this count because Skwarto ordered Kramer to

arrest her and Schlageter submitted a report in support of the

charges brought against her.  (Docket Entry # 62, p. 8).

"Under Massachusetts law, there are three elements of a

malicious prosecution claim.  A plaintiff must establish that

[s]he was damaged because:  (1) the defendant commenced an

original action without probable cause, (2) with malice, and (3)

that the original action terminated in his favor."  Yacubian v.

United States, 750 F.3d 100, 109 (1st Cir. 2014); see Limone v.
United States, 579 F.3d 79, 89 (1st Cir. 2009); Nieves v.
McSweeney, 241 F.3d 46, 53 (1st Cir. 2001).  "In broad brush, an
individual may be said to have instituted criminal proceedings
against another if he caused those proceedings to be initiated.
The paradigmatic example exists when a person formally swears
out a criminal complaint against another person."  Limone, 579
F.3d at 89.

"If an individual induces another person to lodge formal
criminal charges, he may be held to have instituted the criminal
proceedings."  Id.  The mere transmission of information to a
police officer, who then uses his or her independent judgment to
pursue the matter and institutes criminal proceedings, is not
sufficient to support a malicious prosecution claim.  See Boyle
v. Barnstable Police Dept., 818 F.Supp.2d 284, 301-302 (D. Mass.
2011); Correllas v. Viveiros, 572 N.E.2d 7, 10 (Mass. 1991).
"If an individual either exercises a peculiar degree of control
over the charging official or adamantly presses that official to
bring a criminal complaint, he may be held responsible for the
institution of the prosecution."  Limone, 579 F.3d at 89; see
Yacubian, 750 F.3d at 109 n.12 (merely taking steps to
strengthen case does not make agents "continuers" or actors of a
prosecution); see also Bernard v. United States, 25 F.3d 98, 104
(2nd Cir. 1994) (actions by agent after prosecution is brought

cannot support claim of malicious prosecution in bringing the charges).[14]

The record does not create a genuinely disputed fact that Skwarto and Schlageter initiated criminal proceedings against plaintiff. Kramer was the arresting officer and he alone applied for the criminal complaint against plaintiff. (Docket Entry # 60-10, p. 1). The Clerk Magistrate at the Taunton District Court found probable cause to issue each of the charges sought against plaintiff. Nothing in the record demonstrates that Skwarto ordered Kramer to place plaintiff under arrest or file criminal charges against her, as plaintiff has alleged. (Docket Entry # 63, ¶¶ 29, 31, 50) (Docket Entry # 69, ¶¶ 30-31, 50). The record also fails to indicate that Skwarto or Schlageter induced Kramer to file criminal charges against plaintiff. (Docket Entry # 63, ¶ 50) (Docket Entry # 69, ¶ 50). Summary judgment on Count XII is therefore appropriate as to Skwarto and Schlageter.

V. Count XIII

Skwarto and Schlageter next argue that the abuse of process claim in Count XIII fails because there are no facts that Skwarto or Schlageter intentionally caused criminal process to issue against plaintiff with evil intentions. (Docket Entry #

[14]  The First Circuit in Yacubian cites and relies on Bernard. See Yacubian, 750 F.3d at 108 n.13.

59, pp. 14-17).  Plaintiff argues that this claim should not be dismissed against Skwarto and Schlageter because Skwarto ordered Kramer to arrest plaintiff and Schlageter submitted a report in support of the charges brought against plaintiff.  (Docket Entry # 62, pp. 7-8).

A common law claim for abuse of process "requires a plaintiff to show that 'process' was used for an ulterior or illegitimate purpose and resulted in damages."  <u>Yacubian</u>, 750 F.3d at 110; <u>Millennium Equity Holdings, LLC v. Mahlowitz</u>, 925 N.E.2d 513, 522 (Mass. 2010).  In the context of abuse of process, "process" refers to the papers issued by a court to bring a party or property within its jurisdiction.  <u>Jones v. Brockton Pubic Markets, Inc.</u>, 340 N.E.2d 484, 486 (Mass. 1975).  "An abuse of process claim requires that the defendants participate in judicial proceedings against the plaintiff."  <u>Boyle</u>, 818 F.Supp.2d at 304; <u>see</u> <u>Piccone v. McClain</u>, 720 F.Supp. 2d 139, 146 (D. Mass. 2010).

It is well settled that, "in order to establish an abuse of process claim, a plaintiff must provide evidence of an ulterior purpose."  <u>Boyle</u>, 818 F.Supp.2d at 304.  "An ulterior purpose exists when the defendant uses process 'to accomplish some ulterior purpose for which it was not designed or intended, or which was the legitimate purpose of the particular process employed.'"  <u>Id.</u>; <u>Psy-Ed Corp. v. Klein</u>, 947 N.E.2d 520, 534

(Mass. 2011).  As further explained in <u>Boyle</u>, the claim is "'described as a form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'"  <u>Boyle</u>, 818 F.Supp.2d at 305; <u>see</u> <u>Fabre v. Walton</u>, 781 N.E.2d 780, 783 n.3 (Mass. 2002).  "Filing a groundless claim 'is relevant because it may tend to show that the process was used for an ulterior purpose.'"  <u>Boyle</u>, 818 F.Supp.2d at 305; <u>Psy-Ed Corp.</u>, 947 N.E.2d at 534.  The ulterior purpose element, however, "'is not satisfied merely by a showing that a person commenced litigation knowing it was groundless.'"  <u>Boyle</u>, 818 F.Supp.2d at 305; <u>Psy-Ed Corp.</u>, 947 N.E.2d at 534; <u>accord</u> <u>EmpireToday, LLC v. National Floors Direct, Inc.</u>, 788 F.Supp. 2d 7, 23 (D. Mass 2011) ("filing groundless claim or having an improper motive of vexation, harassment, or annoyance is relevant but does not alone suffice to demonstrate ulterior purpose").

The summary judgment record does not include sufficient facts to create a genuine issue concerning the ulterior purpose elements as to either Skwarto or Schlageter.  The record lacks evidence to demonstrate or reasonably infer that Skwarto or Schlageter sought some surrender of plaintiff's property or sought some payment of money.  Even if the prosecution filed against plaintiff was groundless, it would not be enough on its

own to demonstrate an ulterior purpose.  Summary judgment on
Count XIII as to Skwarto and Schlageter is proper.

VI.  Count VI

Skwarto and Schlageter also argue that the section 1983 due
process claim based on their "'filing false charges'" against
plaintiff fails for the same reasons the abuse of process claim
and malicious prosecution claim fails.  (Docket Entry # 59,
n.5).  Skwarto and Schlageter also maintain that plaintiff fails
to point to "'any extreme and egregious,'" or "'conscience-
shocking behavior'" that deprived plaintiff of a protected
interest in her life, liberty, or property.  (Docket Entry # 59,
n.5).  Plaintiff does not address these arguments.  (Docket
Entry # 62).  As discussed previously, plaintiff must show that
the filing of false charges by Skwarto and Schlageter was so
egregious as to shock the conscience and that they deprived
plaintiff of a protected interest in life, liberty, or property.
Harron v. Town of Franklin, 660 F.3d at 536; Pagan v. Calderon,
448 F.3d at 32.  The relevant and applicable law set out in
Roman numeral I(4) need not be repeated.

Here, the record does not create a genuine issue of
material fact of conscience shocking behavior as to Skwarto and
Schlageter.  The filing of false charges against plaintiff does
not rise to the level of "a brutal and inhumane abuse of
official power literally shocking the conscience."  Gonzales-

Fuentes v. Molina, 607 F.3d 864, 881.  The submission of police
reports by Skwarto and Schlageter in regard to the charges filed
against plaintiff does not rise to the level of what courts have
traditionally held as conscience-shocking behavior.  Summary
judgment is therefore warranted on Count VI as to Skwarto and
Schlageter.

VII.  Count XIV

Defendants next argue that the intentional infliction of
emotional distress claims in Count XIV against Skwarto,
Schlageter, Brady, Martin, and Bolton are subject to summary
judgment.  (Docket Entry # 59, pp. 17-18) (Docket Entry # 70, p.
4).  Plaintiff maintains that sufficient facts exist to avoid
summary judgment.  (Docket Entry # 62).

An intentional emotional distress claim requires the
plaintiff to show:

> "(1) that the defendant intended to inflict emotional
> distress or that he knew or should have known that
> emotional distress was the likely result of his conduct;
> (2) that the conduct was extreme and outrageous, was beyond
> all possible bounds of decency and was utterly intolerable
> in a civilized community; (3) that the actions of the
> defendant were the cause of the plaintiff's distress; and
> (4) that the emotional distress sustained by the plaintiff
> was severe and of a nature that no reasonable man could be
> expected to endure it."

Limone v. U.S., 579 F.3d 79, 94 (1st Cir. 2009) (quoting Agis v.
Howard Johnson Company, 355 N.E.2d 315, 318-19 (Mass. 1976)).
"[T]o the extent that police are merely carrying out their

obligation as law enforcement officers, their conduct as a matter of law is not deemed extreme and outrageous." Barbosa v. Conlon, 962 F.Supp.2d 316, 334 (D. Mass. 2013).

Liability is not "predicated on mere insults" or "indignities." Tetrault v. Mahoney, Hawkes & Goldings, 681 N.E.2d 1189, 1197 (Mass. 1997). It is also not "enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Id. (quoting Foley v. Polaroid Corp., 508 N.E.2d 72, 81 (Mass. 1987)) (internal quotation marks omitted). Rather, "Extreme and outrageous conduct is behavior that is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Young v. Wells Fargo Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013); Lund v. Henderson, 22 F.Supp.3d 94, 106 (D. Mass. 2014). Here, as in Lund, plaintiff "cited no case in which an unlawful arrest alone" reached "the level of 'extreme and outrageous conduct.'" Lund, 22 F.Supp.3d at 106. Indeed, the court in Lund allowed summary judgment in a case involving a police officer handcuffing the plaintiff and then dragging him by the handcuffs

"to the police cruiser," at which point the officer hit the plaintiff on the head and pushed him down into the police cruiser. Id. at 100. Similar to the case at bar, the handcuffs caused Lund wrist pain. Id. He also complained about the pain to officers and he sought medical treatment. Id.

Here, plaintiff asserts that "defendant[s] pointed their guns" at plaintiff's grandchildren. (Docket Entry # 62). At her deposition, however, plaintiff testified that she saw two officers with their guns out but she did not witness an officer "point a gun at anyone that night." (Docket Entry # 60-2, p. 117). Although plaintiff argues she was arrested for crimes she did not commit and for which the officers lacked probable cause (Docket Entry # 62), the Clerk Magistrate at the Taunton District Court found probable cause to issue each of the charges sought against plaintiff. (Docket Entry # 60-11). It is true that plaintiff cries whenever she thinks about the incident. She has not sought treatment, however, for the emotional distress or taken medication. (Docket Entry # 60-2, pp. 202-03); see Kennedy v. Town of Billerica, 617 F.3d 520, 530-31 (1st Cir. 2010). Kramer as opposed to Skwarto, Schlageter, Brady, Martin, and/or Bolton made the arrest and ground plaintiff's wrists. Viewing the entire summary judgment record, the facts are insufficient to allow a reasonable finder of fact to conclude that Skwarto, Schlageter, Brady, Martin, and/or Bolton

engaged in extreme and outrageous conduct.  Summary judgment is appropriate as to the intentional infliction of emotional distress claims in Count XIV against Skwarto, Schlageter, Brady, Martin, and Bolton.

## CONCLUSION

The motion for summary judgment (Docket Entry # 58) is **ALLOWED** in part and **DENIED** in part.  After numerous extensions of the dispositive motion deadline, there shall be no further extensions in this case, which plaintiff filed in January 2015. The parties shall file the status report relative to Count XIV within 14 days.  This court will conduct a status conference on November 9, 2017 at 2:30 p.m. to set a trial date.

      /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge